Slip Op. 10-37

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                               :
ALMOND BROS. LUMBER CO. et al.,:
                               :
            Plaintiffs,        :  Before:  Richard K. Eaton, Judge
                               :
       v.                      :  Court No. 08-00036
                               :
UNITED STATES, and             :
RON KIRK, UNITED STATES        :
TRADE REPRESENTATIVE,          :
                               :
            Defendants.        :
_____:
```

OPINION

[Plaintiffs' motion for reconsideration denied.]

Dated: April 8, 2010

*Saltman & Stevens, P.C.* (*Alan I. Saltman, Ruth G. Tiger, Alan F. Holmer*, and *Aron C. Beezley*) for plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, United States Department of Justice Commercial Litigation Branch, Civil Division (*David S. Silverbrand*); Office of the General Counsel, United States Trade Representative (*J. Daniel Stirk*), for defendants.

Eaton, Judge: Before the court is plaintiffs' motion for reconsideration of the May 20, 2009,[1] opinion dismissing their

_____

[1] Since plaintiffs filed their motion for reconsideration, the parties have made, and the court has ruled upon, various other motions. The last motion in this series (plaintiffs' October 23, 2009 motion to supplement the record, which was fully briefed on December 8, 2009), was decided on December 21, 2009. Pursuant to that order, the parties subsequently submitted supplementary testimony and objections thereto, upon which the court ruled on January 22, 2010.

cause of action for lack of subject-matter jurisdiction.  *See* USCIT R. 59*; Almond Bros. Lumber Co. v. United States*, 33 CIT __, Slip Op. 09-48 (May 20, 2009) ("*Almond Bros. I*").  *See* Pls.' Mem. Supp. Mot. Reconsideration ("Pls.' Mem."); Defs.' Resp. Mot. Reconsideration ("Defs.' Resp."); and Pls.' Reply ("Pls.' Reply").

The disputed jurisdictional issue concerns the legal authority by which the United States Trade Representative ("USTR") negotiated and entered into the 2006 Softwood Lumber Agreement with Canada.  *See* Softwood Lumber Agreement Between the Government of Canada and the Government of the United States of America, U.S.-Can., Sept. 12, 2006 (hereinafter "2006 Softwood Lumber Agreement" or "2006 SLA").[2]  Plaintiffs are domestic producers of softwood lumber products and, as described in *Almond Bros. I*, they seek to challenge a provision of the SLA that provides for the Government of Canada to distribute $500 million solely to domestic lumber producers who are members of the Coalition for Fair Lumber Imports (the "Coalition").

On October 21, 2009, the court heard oral argument and held an evidentiary hearing on plaintiffs' motion.  *See* Evid. Hr'g Tr., Oct. 21, 2009 ("Evid. Hr'g Tr.").  As they did in their papers leading to *Almond Bros. I*, plaintiffs insist that this

---

[2]     A copy of the 2006 Softwood Lumber Agreement is available in the library of the United States Court of International Trade.

Court has jurisdiction over their claims because, they argue, the

2006 SLA was negotiated and entered into pursuant to section 301

of the Trade Act of 1974 [19 U.S.C. § 2411(c)(1)(D) (2006)].[3]

_____

[3]     Section 301 of the Trade Act of 1974 is codified at 19
U.S.C. § 2411(c). Under § 2411(c)(1)(D), if the USTR determines
that the rights of the United States under any trade agreement
are being denied, or that an act, policy, or practice of a
foreign country violates a United States trade agreement or
burdens or restricts United States commerce, the USTR is
authorized to

>       enter into binding agreements with such foreign country
>       that commit such foreign country to—
>
>               (i) eliminate, or phase out, the act, policy,
>               or practice that is the subject of the action
>               to be taken under subsection (a) or (b) of
>               this section,
>
>               (ii) eliminate any burden or restriction on
>               United States commerce resulting from such
>               act, policy, or practice, or
>
>               (iii) provide the United States with
>               compensatory trade benefits that—
>
>                       (I) are satisfactory to the Trade
>                       Representative, and
>
>                       (II) meet the requirements of
>                       paragraph (4).

19 U.S.C. § 2411(c)(1)(D).

    Paragraph 4 of § 2411(c) provides:

>       (4) Any trade agreement described in
>       paragraph (1)(D)(iii) shall provide
>       compensatory trade benefits that benefit the
>       economic sector which includes the domestic
>       industry that would benefit from the
>       elimination of the act, policy, or practice
>       that is the subject of the action to be taken

                                              (continued...)

Section 301, together with the provisions that immediately follow it, are commonly referred to as "section 301." *See* Canadian Exports of Softwood Lumber, 56 Fed. Reg. 50,738, 50,739 (initiation of section 302 investigation and request for public comment on determinations involving expeditious action) ("Oct. 8, 1991 Initiation & Determination").  In *Almond Bros. I*, the court found that plaintiffs failed to provide any evidence for this asserted source of jurisdiction: "Beyond the bare claim that the SLA was the product of [section 301], . . . plaintiffs provide no support for their contention that it was negotiated or executed pursuant to that statute, despite having ample opportunity to do so."  33 CIT at __, Slip Op. 09-48 at 17.  Here, the court again finds that plaintiffs have failed to present any evidence that would support their argument for jurisdiction.  Accordingly, plaintiffs' motion for reconsideration is denied.

---

[3](...continued)
>           under subsection (a) or (b) of this section
>           . . . .

19 U.S.C. § 2411(c)(4).

BACKGROUND

I.   History of the Softwood Lumber Disputes Between the United
     States and Canada

     A.   1986 Memorandum of Understanding and 1996 Softwood
          Lumber Agreement

While the history of the 2006 SLA has been thoroughly set

out in *Almond Bros. I*, plaintiffs' sole new argument requires an

examination of the history of other softwood lumber disputes

prior to the negotiation of the 2006 agreement.  Since the early

1980s, the United States has continually quarreled with Canada

over its alleged dumping and subsidization of softwood lumber

exports to the U.S.  *See generally* David Quayat*, The Forest for

the Trees: A Roadmap to Canada's Litigation Experience in Lumber

IV*, 12 J. Int'l Econ. L. 115, 122 (2009) ("Quayat").

In 1986, United States lumber producers filed unfair trade

petitions with the Department of Commerce ("Commerce") and the

United States International Trade Commission ("ITC").  *See*

Certain Softwood Lumber Products from Canada, 51 Fed. Reg.

37,453, 37,454 (Dep't of Commerce Oct. 22, 1986) (preliminary

affirmative countervailing duty determination).  In October 1986,

Commerce issued an affirmative preliminary determination of

subsidization.  *See id.* at 37,453.  Subsequently, the two

countries began negotiations.  Quayat*, 12 J. Int'l Econ. L. at

123.  In December 1986, they entered into a Memorandum of

Understanding (the "1986 MOU") pursuant to which Canada agreed to

impose a tax or charge on softwood lumber exports to the U.S. and the United States agreed to discontinue its investigations. *Id.* at 123 n.55; *see also* Oct. 8, 1991 Initiation & Determination, 56 Fed. Reg. at 50,739.

In September 1991, Canada announced that it would terminate the 1986 MOU, meaning that it would no longer collect the export taxes provided for in that document. Oct. 8, 1991 Initiation & Determination, 56 Fed. Reg. at 50,739. In response, in October 1991, the USTR initiated an investigation to determine whether Canada's unilateral termination of the 1986 MOU was actionable under section 301, i.e., whether Canada's failure "to ensure the continued collection of export charges on softwood lumber envisioned by the MOU" was unreasonable and burdened or restricted United States commerce (the "1991 Investigation"). *Id.* Following the 1991 Investigation, the USTR determined that

> acts, policies, and practices of the Government of Canada regarding the exportation of softwood lumber to the United States, *specifically the failure of the Government of Canada to ensure the continued collection of export charges on softwood lumber envisioned by the MOU*, are unreasonable and burden or restrict U.S. commerce . . . .

*Id.* (emphasis added).

The failure of Canada to collect the export charges was resolved when Canada and the United States signed the 1996 Softwood Lumber Agreement (hereinafter "1996 SLA"). *See* Canadian

Exports of Softwood Lumber, 61 Fed. Reg. 28,626, 28,626 (Office

of USTR June 5, 1996) (notice of agreement; monitoring and

enforcement pursuant to sections 301 and 306) ("Notice of 1996

SLA"). The agreement was

> intended to provide a satisfactory resolution
> to certain acts, policies and practices of
> the Government of Canada affecting exports to
> the United States of softwood lumber that
> were the subject of an investigation
> initiated by the United States Trade
> Representative ("USTR") under section
> 302(b)(1)(A) of the Trade Act of 1974 . . .
> and that were found to be unreasonable and to
> burden or restrict U.S. commerce pursuant to
> section 304(a) on October 4, 1991.

*Id.* As noted, the "acts" that were "found to be unreasonable"

were Canada's failure to collect the export charges provided for

in the 1986 MOU. October 8, 1991 Initiation & Determination, 56

Fed. Reg. at 50,739. The 1996 SLA expired by its terms in 2001.

*See* Notice of 1996 SLA, 61 Fed. Reg. at 28,626.

In May 2002, the Coalition filed new petitions with the ITC

and Commerce, and, after investigations, Commerce imposed both

antidumping duties and countervailing duties on Canadian softwood

lumber. Certain Softwood Lumber Products From Canada, 67 Fed.

Reg. 36,068 (Dep't of Commerce May 22, 2002) (notice of amended

final determination of sales at less than fair value and

antidumping duty order); Certain Softwood Lumber Products From

Canada, 67 Fed. Reg. 36,070 (Dep't of Commerce May 22, 2002)

(notice of amended final affirmative countervailing duty

determination and countervailing duty order).  As a result of
Commerce's imposition of these unfair trade duties, legal
challenges arose in various fora including: this Court; tribunals
under the North American Free Trade Agreement; and the World
Trade Organization.  *Almond Bros. I*,  33 CIT __, Slip Op. 09-48
at 8.[4]  The Coalition was one of the parties to many of these
challenges.  *Id.*


    B.   The 2006 Softwood Lumber Agreement

    In 2006, the United States and Canada began new negotiations
to resolve the proceedings arising from the 2002 imposition of
unfair trade duties.  The negotiations proved successful, and in
September of that year the USTR and the Canadian representative
executed the 2006 SLA.  *See generally* 2006 Softwood Lumber
Agreement.

    Among other things, the 2006 SLA required Canada to
distribute $500 million to United States lumber producers
identified as members of the Coalition.  Plaintiffs, domestic
lumber producers, were not members of the Coalition, and thus
were not designated as beneficiaries of the distributed funds.
*See Almond Bros. I*, 33 CIT at __, Slip Op. 09-48 at 6-9
(detailing plaintiffs' claims).

-----

[4]   A list of these proceedings may be found in the 2006
Softwood Lumber Agreement, Annex 2A.

II.  Procedural History

In *Almond Bros. I*, the court granted defendants' motion to dismiss plaintiffs' lawsuit based on a lack of subject-matter jurisdiction.  In their papers, plaintiffs had insisted that this Court had jurisdiction over their claims pursuant to the "arising under" provisions of 28 U.S.C. § 1581(i).[5]  *Almond Bros. I*, 33 CIT at ___, Slip Op. 09-48 at 17.[6]  The sole statutory authority cited

---

[5]     28 U.S.C. § 1581(i) states:

In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for– . . .

(2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue; . . .

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.

[6]     As discussed in *Almond Bros. I*, the Court of International Trade, like all federal courts, is a court of limited jurisdiction, meaning that it may only review matters within certain boundaries.  33 CIT at ___, Slip Op. 09-48 at 15-17 (citing *Agro Dutch Indus. Ltd. v. United States*, 29 CIT __, __, 358 F. Supp. 2d 1293, 1294 (2005) (citation omitted)).  A primary source of federal jurisdiction rests in "arising under" jurisdiction, provided for under 28 U.S.C. § 1331, which grants jurisdiction to the federal district courts for claims "arising under" federal law.  28 U.S.C. § 1331 ("The district courts shall have original jurisdiction over all civil actions arising under
(continued...)

by plaintiffs as the basis for § 1581(i) arising under

jurisdiction over their case was section 301.

> [P]laintiffs maintain that the court has
> § 1581(i) jurisdiction because the SLA was
> negotiated pursuant to [section 301], which
> provides for the entry into agreements that
> provide for compensatory trade benefits.  For
> plaintiffs, these compensatory trade benefits
> are the equivalent of duties.  *See* 28 U.S.C.
> § 1581(i)(2) ("the [CIT] shall have exclusive
> jurisdiction of any civil action commenced
> against the United States . . . that arises
> out of any law of the United States providing
> for . . . duties . . . on the importation of
> merchandise for reasons other than the
> raising of revenue . . . .").

*Almond Bros. I*, 33 CIT at __, Slip Op. 09-48 at 14 (footnote

omitted).   The court in *Almond Bros. I*, however, found that

plaintiffs did not provide factual support for their theory that

the 2006 SLA was negotiated or entered into pursuant to section

301:  "Because [plaintiffs] have failed to meet their burden of

---

[6](...continued)
 the Constitution, laws, or treaties of the United States."); *see*
 Wright, Miller, & Cooper, 13D Fed. Prac. & Proc. 3d § 3562.
 Accordingly, the law under which the 2006 SLA was entered into is
 crucial to plaintiffs' claims.

   The statute under which plaintiffs claim jurisdiction, 28
 U.S.C. § 1581(i)(4), is also an "arising under" statute.  *See* 28
 U.S.C. § 1581(i)(2) (actions arising out of a law providing for
 duties on the importation of merchandise other than for raising
 revenue) and § 1581(i)(4) (actions arising out of the
 administration and enforcement of paragraph (2) of this
 subsection); *Schick v. United States*, 554 F.3d 992, 994 (Fed.
 Cir. 2009) (finding that the trial court lacked jurisdiction to
 consider claim under § 1581(i)(4) where claim did not arise out
 of a law providing for the administration and enforcement of
 matters referred to in 19 U.S.C. § 1641(g)(2)).

pleading facts from which the court could conclude that the SLA was indeed the product of [section 301], the court cannot accept plaintiffs' argument that it has jurisdiction under the arising under provisions of § 1581(i)."  33 CIT at __, Slip Op. 09-48 at 24-25 (citation omitted).


DISCUSSION

I.   Standard of Review

"The major grounds justifying a grant of a motion to reconsider a judgment are an intervening change in the controlling law, the availability of new evidence, the need to correct a clear factual or legal error, or the need to prevent manifest injustice."  *NSK Corp. v. United States*, 32 CIT __, 593 F. Supp. 2d 1355, 1361 (2008) (quotation and citation omitted); USCIT R. 59(a)(2).


II.  Parties' Arguments

As noted, the central jurisdictional issue in this case is whether the 2006 SLA was negotiated and entered into pursuant to section 301.  In *Almond Bros. I*, the court observed,

> The party seeking to invoke this Court's jurisdiction has the burden of establishing such jurisdiction."  *Autoalliance Int'l, Inc. v. United States*, 29 CIT 1082, 1088, 398 F. Supp. 2d 1326, 1332 (2005) (citations omitted) ("*Autoalliance Int'l*").  A "mere recitation of a basis for jurisdiction, by

> either a party or a court, cannot be
> controlling . . . ." *Norsk Hydro Can., Inc.
> v. United States*, 472 F.3d 1347, 1355 (Fed.
> Cir. 2006) (quotation omitted). "To avoid
> dismissal in whole or in part for lack of
> subject matter jurisdiction, [plaintiffs]
> must plead facts from which the court may
> conclude that it has subject matter
> jurisdiction with respect to each of their
> claims." *Schick v. United States*, 31 CIT
> 2017, 2020, 533 F. Supp. 2d 1276, 1281 (2007)
> ("*Schick*") (citing *McNutt v. Gen. Motors
> Acceptance Corp.*, 298 U.S. 178, 189 (1936)
> (explaining that a plaintiff "must allege in
> his pleading the facts essential to show
> jurisdiction.")).

33 CIT at __, Slip Op. 09-48 at 10. Moreover, "while jurisdictional facts are normally found in the complaint, it is well settled that in considering a Rule 12(b)(1) motion contesting jurisdiction, the court may consider matters outside the pleadings." *Id.* at __, Slip Op. 09-48 at 19 (citing *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Cedars-Sinai Med. Center v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993)). Plaintiffs' motion includes several arguments as to why they have satisfied their burden of pleading facts sufficient to demonstrate jurisdiction, but presents only one theory that has not previously been put before the court. That is, that the October 8, 1991 section 301 investigation and its determinations underlie the 2006 SLA as well as the 1996 SLA.

As an initial matter, it is worth noting that plaintiff's arguments with respect to the effect of the October 8, 1991

section 301 investigation could and should have been raised in their previous arguments before the court and not in their motion for reconsideration. That is, all of the material facts were known to them long prior to making of their motion. For this reason alone, plaintiff's motion should be denied. *See Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) (It is generally accepted that a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the . . . court's original ruling."). Nonetheless, the court will address the new argument.

As the court noted in *Almond Bros. I*, prior to initiating negotiations for an agreement under section 301, the USTR must fulfill certain statutory obligations relating to the initiation of investigations and the making of determinations, including certain publication requirements. *Almond Bros. I*, 33 CIT at __, Slip Op. 09-48 at 22-23. Specifically, the sections succeeding 19 U.S.C. § 2411 set out the steps that the USTR must undertake before action can be taken thereunder:

> If the Trade Representative determines that
> an investigation should be initiated under
> this subchapter with respect to any matter in
> order to determine whether the matter is
> actionable under section [301] of this title,
> the Trade Representative shall publish such
> determination in the Federal Register and
> shall initiate such investigation.

19 U.S.C. § 2412(b)(1)(A) (this subsection is commonly referred

to as "section 302").[7]

Moreover, if the USTR makes any factual determination pursuant to § 2414(a) (i.e., that an act, policy or practice of a foreign country is unjustifiable and burdens or restricts United States commerce), that determination, too, must be published in the Federal Register pursuant to 19 U.S.C. § 2414(c) ("The Trade Representative shall publish in the Federal Register any determination made under subsection (a)(1) of this section, together with a description of the facts on which such determination is based.").[8]  In practice, the USTR has published the notice of initiation and the factual determination simultaneously.  *See, e.g.*, Canada—Compliance With Softwood Lumber Agreement, 74 Fed. Reg. 16,436, 16,436 (Office of the USTR

---

[7]    19 U.S.C. § 2412 sets out the procedures for the required investigation.  *See, e.g.*, Wheat Trading Practices of the Canadian Wheat Board, 65 Fed. Reg. 69,362, 69,363 (Office of the USTR November 16, 2000) (notice announcing the initiation of an "investigation to determine whether certain acts, policies or practices of the Government of Canada and the Canadian Wheat Board with respect to wheat trading are unreasonable and burden or restrict U.S. commerce and are, therefore, actionable under section 301.").

[8]    It is worth noting that the USTR has sought to comply with the section 301 provisions relating to investigations and determinations when seeking to enforce the 2006 SLA.  *See* Canada—Compliance With Softwood Lumber Agreement, 74 Fed. Reg. 16,436, 16,436 (Office of the USTR Apr. 10, 2009) (notice of initiation of investigation of and determination that Canada "is denying U.S. rights under the SLA").  Thus, it is clear that the USTR knows how to comply with section 301 when he or she wishes to take action pursuant to its provisions.

Apr. 10, 2009) (notice of initiation of investigation of and determination that Canada "is denying U.S. rights under the SLA").  In *Almond Bros. I*, the court found that none of the required acts necessary for action to be taken pursuant to section 301 had been performed and, therefore, that the 2006 SLA was not a product of that section.  *Almond Bros. I*, 33 CIT at __, Slip Op. 09-48 at 22-24.

Plaintiffs now claim that the mandatory prerequisite actions were taken and that the section 301 publication requirements were met with respect to the 2006 SLA.  According to plaintiffs, the October 8, 1991 publication, giving notice of the 1991 section 301 investigation and October 8, 1991 determination that underpinned the 1996 SLA, also provided the basis for the 2006 SLA.  *See* Evid. Hr'g Tr. 14-15.

> [I]n 1996, the USTR entered a softwood lumber agreement (the "1996 SLA") which, just like the 2006 SLA, was intended to ameliorate the effect of the export of subsidized softwood lumber products from Canada to the United States without the imposition of any export charges.  The USTR entered into the 1996 SLA pursuant to [section 301] on the basis of an earlier [1991] investigation initiated under § 2412 and a determination made under § 2414 that Canada's conduct was unreasonable and burdened or restricted United States commerce.  Because the situation in 2006 in all relevant respects was the same as it had been in 1996, these findings and determination remained valid.

Pls.' Mem. 3.  Accordingly, plaintiffs contend, "[b]ased on these

[1991] findings and the [1991] determination, the USTR entered into the 2006 SLA pursuant to [section 301], just as her predecessor had entered the 1996 SLA." Pls.' Mem. 3. In other words, plaintiffs argue that the 1991 investigation satisfied the requirements for an affirmative determination under § 2414(a) and publication of that determination under § 2414(c), both of the necessary procedural steps for the 2006 SLA to have been authorized under the authority of section 301. Plaintiffs make this claim notwithstanding their concession that the 1991 determination and publication served as the section 301 predicates for the intervening 1996 SLA that expired by its terms in 2001.

In response to plaintiffs' allegations, defendants argue that plaintiffs' contention that "because the USTR used its section 301 authority to impose retaliatory measures upon imports of softwood lumber in 1991 and to enter into the Softwood Lumber Agreement of 1996, the USTR must have entered into the [2006] SLA pursuant to Section 301," is "without basis." Defs.' Resp. 6. Rather, defendants argue, "no part of the negotiations or entry into force of the [2006] SLA entailed any statutory authority derived from section 301." Defs.' Resp. 6.

III. Plaintiffs Fail to Present Facts Sufficient for the Court to
     Find Jurisdiction over Their Claims

Plaintiffs' primary argument is that the 1991 investigation satisfied the mandatory section 301 requirements for entry into the 2006 SLA because "the situation in 2006 in all relevant respects was the same as it had been in 1996, [and thus the 1991] findings and determination remained valid." Pls.' Mem. 3. Contrary to plaintiffs' contentions, however, the publication of USTR's Oct. 8, 1991 Initiation & Determination does not serve to satisfy the section 301 statutory prerequisites necessary for the entry into the 2006 SLA. As the United States points out, the 1991 Investigation was initiated as a result of Canada's withdrawal from the 1986 MOU and subsequent failure to collect export charges. Following this September 1991 withdrawal, the USTR initiated an investigation, pursuant to section 301, to determine whether Canada's failure "to ensure the continued collection of export charges on softwood lumber envisioned by the MOU" was unreasonable and burdened or restricted United States commerce. Oct. 8, 1991 Initiation & Determination, 56 Fed. Reg. at 50,739. In other words, the stated purpose of the 1991 Investigation was to determine if the failure of Canada to collect the export taxes, provided for in the 1986 MOU, was "unreasonable" and "burden[ed] or restrict[ed]" United States commerce. Thus, the 1991 Investigation and Determination dealt

with a particular set of facts extant during a particular period

of time.

        This point is brought home by the USTR's 1991 factual

determination:

> On September 3, 1991, the Government of
> Canada announced that it would terminate the
> MOU in 30 days. . . .
>
> Since the Government of Canada has refused to
> *collect export charges to offset possible*
> *subsidies during this period*, the United
> States is compelled to exercise its rights
> and to take enforcement measures arising out
> of the MOU by imposing temporary measures to
> safeguard against an influx of possible
> injurious subsidized Canadian softwood
> lumber. . . .
>
> On October 4, 1991, the USTR, having
> consulted pursuant to section 302(b)(1)(B)
> [19 U.S.C. § 242(b)(1)(B)] of the Trade Act,
> determined that an investigation should be
> initiated with respect to certain acts,
> policies, and practices by the Government of
> Canada affecting exports to the United States
> of certain softwood lumber products. . . .
>
> Accordingly, the USTR, at the specific
> direction of the President, has made the
> following determinations pursuant to section
> 304 of the Trade Act [including] [t]hat acts,
> policies, and practices of the Government of
> Canada regarding the exportation of softwood
> lumber to the United States, *specifically the*
> *failure of the Government of Canada to ensure*
> *the continued collection of export charges on*
> *softwood lumber envisioned by the MOU*, are
> unreasonable and burden or restrict U.S.
> commerce . . . .

Oct. 8, 1991 Initiation & Determination, 56 Fed. Reg. at 50,738-

39 (emphasis added).  Thus, the 1991 factual determination made a

specific finding with respect to the collection of export taxes that were required by the 1986 MOU.

The question of the harm found by the USTR in 1991 was subsequently resolved by the entry into the 1996 SLA. Notice of 1996 SLA, 61 Fed. Reg. at 28,626. The important point, however, is that the 1996 SLA resulted from Canada's failure, in 1991, to collect the taxes required by the 1986 MOU which failure was found to be unreasonable and to burden or restrict United States commerce. Thus, the specifics found in the 1991 Investigation and set out in the determination related directly to Canada's withdrawal from the 1986 MOU, and not to more general concerns about softwood lumber dumping or subsidization.

In addition, although plaintiffs insist otherwise, the factual situation in 2006 was markedly different from that in 1991. In 1991, when Canada terminated the 1986 MOU, no dumping or countervailing duty orders were in place. Thus, neither the 1991 Investigation nor the October 8, 1991 determination took antidumping duty orders into account.[9] However, by 2006,

---

[9] Following the October 8, 1991 Initiation & Determination relating to the 1991 Investigation, Commerce self-initiated a countervailing duty investigation (Certain Softwood Lumber Products From Canada, 56 Fed. Reg. 56,055, 56,055 (Dep't of Commerce October 31, 1991) (self-initiation of countervailing duty investigation)), resulting in an affirmative final determination that imposed a countervailing duty of 6.51%. Certain Softwood Lumber Products from Canada, 57 Fed. Reg. 22,570, 22,570 (Dep't of Commerce May 28, 1992) (final
                                                        (continued...)

determinations regarding both dumping and countervailing duties existed and were being contested. *See supra* p.7. The settlement of these cases was the primary subject of the negotiations in 2006. *See Tembec, Inc. v. United States*, 31 CIT 241, 244, 475 F. Supp. 2d 1393, 1397 (2007) ("On September 12, 2006, the Governments of Canada and the United States signed an agreement designed to settle the softwood lumber dispute . . . ."). Pursuant to the 2006 SLA, both governments, as well as all represented parties and participants, agreed to terminate the legal actions related to softwood lumber to which they were parties. *See* Softwood Lumber Agreement, art. II and Annex 2A. Therefore, the facts demonstrate that the 2006 SLA was intended to resolve the controversies arising from the imposition of specific unfair trade duties on Canadian softwood lumber.

As has been seen, plaintiffs still fail, on their motion for reconsideration, to present facts that would put this case within this Court's jurisdiction. "To avoid dismissal in whole or in part for lack of subject matter jurisdiction, [plaintiffs] must plead facts from which the court may conclude that it has subject matter jurisdiction with respect to each of their claims." *Schick v. United States*, 31 CIT 2017, 2020, 533 F. Supp. 2d 1276,

---

[9](...continued)
affirmative countervailing duty determination). The issue of the imposition of these duties was also resolved by the 1996 SLA. *See* Notice of 1996 SLA, 61 Fed. Reg. at 28,626.

1281 (2007)(citation omitted).  After plaintiffs filed their motion for reconsideration, the court undertook to determine if there were any jurisdictional facts that had been overlooked in *Almond Bros. I.*  To make this determination, the court ordered further oral argument and an evidentiary hearing.  At the October 21, 2009 evidentiary hearing, plaintiffs called no witnesses to support their position, despite having previously deposed the chairman of the section 301 committee[10] from the time of the

---

[10]    "The Chairman of the Section 301 Committee shall be designated by the Deputy Special Representative from the Office of the Special Representative for Trade Negotiations."  15 C.F.R. § 2002.3 (2009). The Section 301 Committee performs the following functions:

(1) Reviews complaints received pursuant to section 301 of the Trade Act of 1974.

(2) Provides an opportunity by the holding of public hearings upon request by a complainant or an interested party, as appropriate, and by such other means as the Special Representative, a Deputy Special Representative or the Chairman of the Section 301 Committee deems appropriate, for any interested party to present his views to the Section 301 Committee concerning foreign restrictions, acts, policies, and practices affecting U.S. commerce, and United States actions in response thereto, as provided for in Section 301 of the Trade Act (Pub.L. 93-618, 88 Stat. 1978).

(3) Reports to the Trade Policy Staff Committee the results of reviews and hearings conducted with respect to complaints received pursuant to Section 301 of the Trade Act.

(4) On the basis of its review of petitions filed under Section 301 and of the views received through hearings or otherwise on such petitions, makes recommendations

(continued...)

negotiations for the 2006 SLA until now.  Specifically,

defendants made available for deposition William Busis, who

> has held the position of section 301 chairman
> continuously since the negotiations leading
> to the [2006] SLA began and, therefore, would
> possess knowledge of any actions the USTR has
> taken pursuant to section 301 during that
> time, including whether the United States
> entered the SLA pursuant to the provisions of
> 19 U.S.C. [§] 2411(c)(1)(D).

Defs.' Resp. Pls.' Mot. for Leave to Take Depositions 5.

In fact, the only evidence that was presented to the court,

tending to establish the source of the USTR's authority to enter

into the 2006 SLA, indicates that it was negotiated not pursuant

to section 301, but pursuant to the USTR's general authority,

including that found in 19 U.S.C. § 2171.[11]  Defendants' Hearing

Exhibit B includes a letter regarding the 2006 SLA that was

submitted to the United States Department of State on October 1,

2007, seeking guidance on the necessary compliance with the Case-

Zablocki Act, codified at 1 U.S.C. § 112b.  The Act requires that

---

[10](...continued)
      to the TPSC for review by that committee.

15 C.F.R. § 2002.3(b).

[11]    By 19 U.S.C. § 2171, the USTR was established within the
Executive Office of the President and has "primary responsibility
for developing, and for coordinating the implementation of,
United States international trade policy,    . . . and shall be
the chief representative of the United States for . . .
international trade negotiations . . . ." 19 U.S.C.
§ 2171(c)(1)(A), (C).

international agreements, other than treaties, be transmitted to
Congress within sixty days after the agreements have entered into
force.[12]  Attached to the letter is a background statement
identifying the legal authority under which the SLA was
negotiated and entered into:

> The agreement was concluded under the general
> authority of the Office of the United States
> Trade Representative to negotiate, including
> pursuant to USTR's authority under the Trade
> Act of 1974, as amended.

Letter from Carmen Suro-Bredie to John Kim, Esq. (Oct. 1, 2007).

For the court, this statement supports defendants'
contention that the 2006 SLA was the product of the USTR's

---

[12]    1 U.S.C. § 112b(a) states:

The Secretary of State shall transmit to the Congress
the text of any international agreement (including the
text of any oral international agreement, which
agreement shall be reduced to writing), other than a
treaty, to which the United States is a party as soon
as practicable after such agreement has entered into
force with respect to the United States but in no event
later than sixty days thereafter.  However, any such
agreement the immediate public disclosure of which
would, in the opinion of the President, be prejudicial
to the national security of the United States shall not
be so transmitted to the Congress but shall be
transmitted to the Committee on Foreign Relations of
the Senate and the Committee on International Relations
of the House of Representatives under an appropriate
injunction of secrecy to be removed only upon due
notice from the President.  Any department or agency of
the United States Government which enters into any
international agreement on behalf of the United States
shall transmit to the Department of State the text of
such agreement not later than twenty days after such
agreement has been signed.

general authority, including § 2171, and not the specific authority found in section 301. This is because § 2171 is part of the Trade Act of 1974 and provides for the USTR's general authority as "the chief representative of the United States for international trade negotations." 19 U.S.C. § 2171(c)(1)(C).

Plaintiffs, however, dispute this conclusion and argue that the phrase "under the Trade Act of 1974" introduces ambiguity into the sentence. Evid. Hr'g Tr. 9-10, 19. Specifically, plaintiffs contend that there was no need to include the latter phrase if § 2171 were indeed the authority under which the 2006 SLA was negotiated and entered into, because § 2171 itself outlines the general authority of the USTR. Evid. Hr'g Tr. 9-10, 19. Put another way, plaintiffs contend that if the 2006 SLA were the product of the USTR's general authority, it would be redundant to say "including pursuant to the USTR's general authority under the Trade Act of 1974 . . . ." Plaintiffs then note that section 301 is also part of the Trade Act of 1974 and that the Exhibit B letter may, in fact, make reference to that section. For plaintiffs, their reading would move the sentence from the less specific "general authority" to the more specific provisions of section 301. Thus, plaintiffs claim, if § 2171 were truly the source of authority for the 2006 SLA, the recitation that the agreement was "concluded under the general authority of the Office of the United States Trade

Representative" would have sufficed.  Therefore, according to plaintiffs, the inclusion of more specific language citing the Trade Act of 1974 leaves open the possibility that the USTR was acting under both the general authority of section 2171, and the more specific authority of section 301, when negotiating the 2006 SLA.

Despite plaintiffs' contentions, the court sees no ambiguity.  This is because the general authority of the USTR does not derive solely from the Trade Act of 1974.  The USTR is part of the Executive Office of the President. 19 U.S.C. § 2171(a); Office of the United States Trade Representative, Mission of the USTR, http://www.ustr.gov/about-us/mission (last visited Mar. 16, 2010).  "[T]he USTR, a member of the Executive Office of the President, acts at the direction of the President as his negotiating arm in international trade matters."  *Gilda Indus., Inc. v. United States*, 28 CIT 2001, __, 353 F. Supp. 2d 1364, 1369 (2004) (citing 19 U.S.C. § 2171), *aff'd in part, vacated in part, and remanded on other grounds*, 446 F. 3d 1271 (Fed. Cir. 2006).

Both the President and the USTR are officers of the United States.  *Motion Systems Corp. v. Bush*, 28 CIT 806, 813, 342 F. Supp. 2d 1247, 1254 (2004).

> With respect to the President, status as an officer of the United States stems from the Constitution itself, for the President is the essential constitutional officer under Article II of the Constitution. "The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years . . . . "  U.S. CONST., Art. II, § 1.  "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

*Id.*  The President's authority to conduct foreign policy derives mainly from the United States Constitution.  *See* U.S. CONST. art. II, § 2, cl. 1.  The USTR, in acting on behalf of the President, derives his or her authority from both the Constitution and from statutes such as § 2171.  Thus, a reference to both the USTR's general authority and to more specific statutory authority creates no ambiguity.  That is, the reference in the October 1, 2007 letter to "the general authority" of the USTR followed by a specific reference "including [the] USTR's authority under the Trade Act of 1974" proceeds from the general to the specific: i.e., the reference to the USTR's general authority that derives mainly from the Constitution; and the reference to the Trade Act of 1974, meaning the statutory grant of general power found in § 2171.

CONCLUSION

Having reviewed all of the parties' submissions and having heard their oral arguments and reviewed the evidence presented at the evidentiary hearing, the court finds that, even taking into account plaintiffs' arguments raised for the first time here, they have failed to provide any evidence that would require reconsideration of the decision that this Court lacks subject-matter jurisdiction over plaintiffs' claims.  Therefore, plaintiffs' motion for reconsideration is denied.

                                    /s/ Richard K. Eaton
                                    Richard K. Eaton

Dated:    April 8, 2010
          New York, New York

<u>Errata</u>

*Almond Bros. Lumber Co. et al v. United States*, Court No. 08-00036, Slip Op. 10-37 (Apr. 8, 2010)

Page 11, line 21: Insert """" at beginning of block quote.

Page 13, line 6:  Insert """" before "It" inside parenthetical.